IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


ROY RIPPEON                          *
                                     *
                                     *
v.                                   *
                                     *    Civil No. WMN-10-1225
                                     *
FREDERICK COUNTY BOARD OF            *
EDUCATION et al.                     *
                                     *
   *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM

Before the Court is Defendants' Motion for Summary

Judgment.  ECF No. 24.  The motion is fully briefed.  Upon a

review of the motion and the applicable case law, the Court

determines that no hearing is necessary, Local Rule 105.6, and

that the motion should be granted.

## I. FACTUAL BACKGROUND

Plaintiff Roy Rippeon was employed as an electrician for

Frederick County Public Schools (FCPS) from 1999 until the

termination of his employment in July of 2008.  Plaintiff

alleged in his Complaint that he was terminated for going to the

news media about certain fraudulent practices of his fellow

employees.  He also alleged that his termination was in

violation of his constitutional due process rights and

constituted a breach of his employment contract.  The Complaint

contained: a claim under 42 U.S.C. § 1983 for violation of his

free speech rights under the First Amendment and his procedural

due process rights under the Fourteenth Amendment (Count I); a claim of breach of contract (Count IV); and several tort claims (Counts II, III, and V) that were dismissed upon Plaintiff's concession that he had failed to comply with the provisions of Maryland's Local Government Tort Claims Act. See ECF Nos. 9 & 10 (Sept. 9, 2010, Mem. & Order). Plaintiff named as Defendants the Frederick County Board of Education (Board of Education) and several employees of Frederick County Public Schools. In its ruling on Defendants' Motion to Dismiss, the Court dismissed Defendant Board of Education from the § 1983 claim.

Discovery is now completed and Defendants have moved for summary judgment on the two remaining counts. Defendants offer a variety of arguments in support of their motion, several of which would entitle them to judgment. The arguments that the Court finds most compelling and on which it will focus in this memorandum are the overwhelming and uncontested evidence that Plaintiff was fired for repeated acts of misconduct and insubordination and that, leading up to his termination and after his termination, he was given more due process than what is called for under the Constitution or under the terms of his employment.

At all times relevant to this suit, Plaintiff worked in the Maintenance Division of FCPS. The Maintenance Division is comprised of about 100 employees, assigned to ten different

maintenance offices or "clusters." When Plaintiff was hired in April of 1999, he was assigned to the Thomas Johnson Cluster. Plaintiff's immediate supervisor was Dave Gower, Gower's immediate supervisor was Ed Haberly (Manager of the Cluster Maintenance Program), Haberly's immediate supervisor was Joseph Dattoli (Facilities Manager), and Dattoli's immediate supervisor was Ray Barnes (Executive Director of Facilities Services). In January 2001, Plaintiff began to make complaints to various individuals up the chain of supervision concerning Gower and one of the other workers in the Thomas Johnson Cluster, Ronnie Linton. Specifically, he complained that Gower and Linton were falsifying time sheets and leave records and that Gower was an abusive supervisor. See Ex. 2 at 604-06.[1] Barnes and Dattoli conducted a thorough investigation of Plaintiff's allegations and concluded they were without merit. Id. at 608. For example, when Plaintiff complained that Linton left early on a particular day and did not take leave, Barnes and Dattoli confirmed that Linton had gone to attend a Staff Improvement Team Meeting at the Maintenance Department headquarters. Id. at 604.

While the investigation of Plaintiff's complaints and allegations did not lead to the discovery of any misconduct, it

---

[1] Defendant's Exhibit 2 is a copy of a portion of Plaintiff's very extensive personnel file.

did uncover a strong clash of personalities and seriously diminished morale within the cluster. Id. at 606. Concluding that the current mix of personnel making up the cluster could not function effectively, Barnes transferred Plaintiff from the Thomas Johnson Cluster to the Urbana Cluster effective March 19, 2001. Plaintiff's supervisor at the Urbana Cluster initially was Larry Rough.

Between March 2001 and June 2006 while assigned to the Urbana Cluster, Plaintiff was disciplined on numerous occasions for unsatisfactory job performance. His difficulties at the Urbana Cluster began almost immediately when he failed to report to work for the first four days after the reassignment. Id. at 602. In the next two weeks, he missed an additional three days. Id. Dattoli and Barnes met with Plaintiff on March 26, 2001, to give Plaintiff a verbal warning concerning these infractions and Plaintiff indicated that he had "learned some important lessons in his conflict with his former supervisors [and] would seek to avoid this type of conflict in the future." Id. at 598 (Mar. 28, 2001, Barnes Mem. to File).

On April 9, 2001, Rough issued a written warning to Plaintiff for attendance, leave without approval, and the failure to provide notice or reasons for his absences. See id. at 595. Shortly thereafter, Plaintiff directed "vulgarity and profanity" at Rough, his supervisor, in a telephone call to

Dattoli.  Id.  On April 12, 2001, Haberly sent a memorandum to Defendant Robert Hagans, Senior Manager in FCPS's human resources department, suggesting the alternatives of either referring Plaintiff to the Employee Assistance Program (EAP) to "improve his mental problems" or proceeding with termination of his employment.  Id. at 596.  Haberly opined that there was sufficient documentation at that time to proceed with termination.  Id.

The warnings apparently had little effect.  On September 6, 2001, Haberly issued Plaintiff a formal reprimand based upon Plaintiff's continued unsatisfactory job performance.  Id. at 584.  Between the April warning and the September reprimand, Plaintiff missed work without applying for leave on nine occasions and called in sick on an additional four days without providing the requisite doctor's certification.  The reprimand stated that it was issued in hopes that Plaintiff would realize that his future with the Maintenance Department was in jeopardy. Id.

In January 2003, Plaintiff was issued another formal reprimand after his tardiness, absenteeism, and failure to provide notice of leave "continu[ed] to surface once again." Id. at 528.  On January 21, 2003, Haberly sent a memorandum to Plaintiff notifying him that Rough had found it necessary to bring a disciplinary action against Plaintiff for his continued

poor attendance.  Plaintiff was informed that this was a "very serious situation" and that Haberly was considering recommending termination.  Id. at 504.

As an alternative to termination, Plaintiff entered into a 180-day "Remedial Action Plan."  Id. at 502-03.  Under the plan, Plaintiff agreed that he would communicate all absences, tardiness, and attendance issues directly to Rough or, if Rough were unavailable, to Haberly.  Bypassing his supervisor would constitute a "failure for the purpose of this plan."  Id.

With some miscues, Plaintiff was able to abide by the plan for several weeks, until March 11, 2003.  On that date, Plaintiff was several hours late for work and, instead of speaking directly with Rough or Haberly as required under the Remedial Action Plan, he simply called and left a voice message. Plaintiff acknowledged his violation of the plan and accepted, by way of settlement, a five-day suspension without pay. Plaintiff was also informed that "further infractions of this kind would result in more severe disciplinary action up to and including termination of employment."  Id. at 479.

Plaintiff's unsatisfactory job performance and failure to communicate with his supervisor surfaces in his personnel file again in June of 2006.  Id. at 457.  By this time, Defendant Robert Johnson had replaced Rough as Supervisor of the Urbana Cluster.  According to a note in his personnel file, Plaintiff

was scheduled to attend a meeting with Haberly and Johnson concerning his job performance on June 11, 2006, but Plaintiff failed to attend.  Id.  On July 6, 2006, Plaintiff received an employee evaluation reflecting that he "needs improvement" in seven of the nine listed categories.  Id. at 427-28.

On January 18, 2007, Plaintiff called the office of Defendant Linda Burgee, the Superintendent of the entire county school system, to allege that four of his seven co-workers in the Urbana Cluster, including Johnson, his supervisor, were falsifying time sheets.  Id. at 425.  In attempting to contact the Superintendent, Plaintiff was bypassing at least four levels of supervision, as well as Human Resources.  Plaintiff then brought the same allegations to Barnes, again skipping several levels of supervision, on January 22, 2007.  Barnes and Defendant Robert Wilkinson (who replaced Dattoli as Facilities Manager in 2005) met with Plaintiff on January 29, 2007.  Barnes and Wilkinson indicated to Plaintiff that they would investigate his complaints.

The record reveals that a thorough investigation was conducted by Haberly.  See id. at 349-51, 353-54, 357-362, 363-64, 394.  Impatient with the pace of the investigation, however, Plaintiff contacted Wilkinson on February 16, 2007, and stated that he was going to go to the media and "let you talk to the reporters."  Id. at 342.  Wilkinson spoke with Plaintiff later

that same day and told him that they had the factual data in hand and were looking for anomalies that would provide factual support for his allegations. In the course of this conversation, Plaintiff acknowledged that Johnson had asked to speak with Plaintiff but Plaintiff had refused to return to work and Johnson had threatened him with discipline. Wilkinson told Plaintiff that "while he [Plaintiff] may be right about certain issues, he still had to abide by a lawful command of his supervisor." Id. After meeting with Defendant Hagans to verify that he was pursuing the investigation properly, Wilkinson called Plaintiff again on February 22, 2007, to assure him that the investigation was progressing. Id. at 343. He also asked Plaintiff to "rethink his threat to involve the press." Id.

On March 1, 2007, Wilkinson shared his preliminary conclusion with Plaintiff that the data did not seem to verify his claims. He again discouraged Plaintiff from seeking out the press. Id. On April 24, 2007, Wilkinson sent Plaintiff a letter stating that Plaintiff's allegations were investigated and found to be without merit. Id. at 309. Wilkinson offered Plaintiff the opportunity to provide any verifiable proof that he might have to substantiate his claims of wrongdoing. The letter also cautioned, however:

> Barring any verifiable proof, you are hereby
> ordered to cease and desist making any further
> allegations. If you continue to make unsubstantiated

allegations of this sort, we will begin disciplinary action (per Board of Education Policy, Section 323) to address your misconduct and insubordination.  This action should not be construed as being done to prevent you from reporting legitimate reports of this nature.  However groundless allegations or false statements by employees that misrepresent legitimate business practices or working requirements of FCPS will cause irrecoverable damage to our employees' reputation and working moral.

Id.

Continued concerns about Plaintiff's job performance and insubordination arose in June of 2007.  On June 27, 2007, Wilkinson sent Plaintiff a letter outlining the scope of those concerns and informing Plaintiff that he was recommending a two-week suspension without pay.  The letter included reference to a June 8, 2007, voice message Plaintiff directed to Barnes demanding a response to his allegations regarding the Urbana Cluster by the end of the day or Plaintiff would go to the media.  The letter also cited Plaintiff's improper use of leave, repeated tardiness, and continued refusal to report to his supervisor.  Id. at 294-95.

The next morning, Johnson instructed Plaintiff to go to Wilkinson's office to meet with Wilkinson and Haberly. Plaintiff flatly refused, despite Johnson's repeated instruction.  Id. at 293.  When learning of his refusal, Wilkinson determined that, after first ensuring that Plaintiff was clear that his supervisor directed him to attend a meeting

and it was verified that Plaintiff refused, Plaintiff's employment should be terminated. Plaintiff was issued a termination letter on that date.

A meeting was held on July 2, 2007, to discuss Plaintiff's termination at which Plaintiff was present, along with his counsel. It was agreed at that meeting that the letter of termination would be rescinded and another meeting would be scheduled to determine the appropriate disciplinary action. Id. at 280. It was subsequently decided that Plaintiff would be given a two-week suspension without pay and that he would return to work subject to a six-month "Performance Correction Plan." As part of that plan, Plaintiff was required to attend three counseling sessions with the EAP for anger management. He was also required to "comply with directives given by his supervisors and if he disagrees with those directives, he will comply with the directive and then exercise his right to appeal or grieve through appropriate channels." Id. at 281. To provide him the opportunity for a fresh start, Plaintiff was transferred to the Frederick Cluster where his immediate supervisor was Richard Gue. Plaintiff initially performed well in the Frederick Cluster and, on January 28, 2008, Haberly

issued a memorandum concluding that Plaintiff successfully met all the requirements of the plan.[2]  Id. at 249-50.

The calm, however, was not long lasting.  On April 29, 2008, Plaintiff called the office of Defendant Burgee, the Superintendent of FCPS, to complain about various issues including satellite parking policies and employees driving work vehicles to their homes in other states.  Id. at 54.  He also reported that he and other employees were attempting to start a new union and were also getting up a petition to get rid of Wilkinson and Barnes.

On May 6, 2008, FCPS management received a report from one of its employees, Vickie Brashears, of an incident involving Plaintiff.  Brashears is the sister of Plaintiff's immediate supervisor, Richard Gue, and she reported that when she walked into the cafeteria in one of the FCPS schools, she overheard Plaintiff "ranting and raving" about her brother and threatening to "hit that son-of-a-bitch."  Id. at 183.  Plaintiff was apparently upset because he was denied the use of a work van. When Brashears asked Plaintiff to leave, he continued to go on ranting and Brashears reported that she was "pretty shaken" by the incident.  Id.

---

[2]  While Plaintiff claimed to have completed this requirement, it was discovered after his termination that he had only attended two sessions.  Id. at 830.

In response to this incident, as well as his circumvention of the chain of supervision by contacting Superintendent Burgee, Plaintiff was placed on paid administrative leave pending an investigation. As a result of the investigation, Plaintiff was placed under a "Last Chance Agreement." Id. at 244-45. Under this Last Chance Agreement, Plaintiff received a thirty-day suspension without pay and was required to attend three EAP counseling sessions. The agreement also provided that "[i]n all grievances, complaints or disagreements [Plaintiff] must follow the chain of command and try to resolve the issue at the lowest level. Any other action or conduct is unacceptable." Id. at 244. The agreement closed with the warning, "please be aware that a Last Chance Agreement is just that. Any deviation or violation of the agreement will result in termination of your employment with [FCPS]." Id. at 245. Plaintiff signed the agreement on May 30, 2008, indicating that he agreed with its terms and conditions. Id.

Under the Last Chance Agreement, Plaintiff was scheduled to return to work on July 1, 2008. As of July 7, 2008, Plaintiff had yet to return to work so he was contacted by Human Resources. Plaintiff explained that he was told by Defendant Hagans that he could not return to work until he completed the mandatory three EAP counseling sessions. Id. at 231. Plaintiff asserts that it was also his understanding that he could not

attend the EAP sessions until after he had returned to the FCPS payroll.  In his conversation with the Human Resources representative, Christine Jacobs, Plaintiff also stated that he was "really getting tired of all of this" and wished that they would just fire him so he could contact an attorney and the media.  Id. at 217.

In a conversation with Hagans on June 26, 2008, Plaintiff was informed that he had to complete the EAP sessions before he would be able to return to work.  Plaintiff claims that he then scheduled appointments for June 27, 28, and 30, but EAP cancelled those sessions.  When the vendor that provides EAP services for FCPS was contacted to confirm Plaintiff's claims, it responded that, while Plaintiff was offered appointments on June 27 and 28, he either failed to respond to the offer or explicitly declined the offer.  Id. at 185.  The vendor reported it had no record of any June 30 appointment.  Id.  An appointment was eventually scheduled for July 9, 2008.  Plaintiff attempted to cancel that appointment on the morning of the appointment but, after being told that he would be considered non-compliant with his agreement, he attended his first counseling session.

Also on July 9, 2008, Superintendent Burgee, Barnes, and Wilkinson each received telephone calls from Caitlin McCarthy, a reporter from a local television station, stating that she had

spoken with Plaintiff about "some issues he was having with being suspended and everything." Id. at 227. Barnes spoke with McCarthy on July 10, 2008, and she reported that Plaintiff had told her that he was suspended for being a whistleblower concerning remote parking and his previous charges of timesheet fraud. Id. at 213.

Hagans scheduled a meeting with Plaintiff for July 15, 2008, for the purpose of determining whether Plaintiff was in violation of the Last Chance Agreement. On July 9, 2008, within a few hours after learning that Plaintiff contacted a reporter, Wilkinson sent an email to Hagans stating that "[i]f after meeting with [Plaintiff] on July 15th, you find that he has disregarded the conditions of his suspension and the Last Chance Agreement, I recommend that he be terminated." Id. at 225. At the request of Plaintiff's attorney, the July 15th meeting was moved to July 16th.

At the July 16, 2008, meeting, Plaintiff initially denied that he had contacted the media and suggested "it may have been a family member, I don't know." Id. at 221; see also, id. at 213. Barnes invited Plaintiff and his counsel to contact McCarthy to get a statement that it was not Plaintiff that made the initial phone call to her station but no statement was forthcoming. Plaintiff now acknowledges that he did contact the reporter. By July 16, 2008, Plaintiff had still not completed

the three mandatory EAP sessions that would have enabled him to return to work although Plaintiff did attend his second EAP session on that date. Plaintiff's third session was scheduled for July 23, 2008, but it was cancelled by Plaintiff. Id. at 186.

After the July 16, 2008, meeting, Barnes conferred with Wilkinson and determined that Plaintiff was in violation of the May 30, 2008, Last Chance Agreement, based on the following incidents: (1) his telephone comments and threats to Jacobs and Wilkinson; (2) his failure to promptly schedule his EAP sessions; (3) his failure to follow the chain of command and to follow the proper grievance procedures before contacting an outside agency; and (4) his personal tendency to blame others for his insubordination or to accuse them of lying. Id. at 214. Accordingly, Wilkinson and Barnes determined that Plaintiff should be terminated. Wilkinson conveyed that termination to Hagans who concurred in the decision and so notified Plaintiff by letter dated July 24, 2008. Id. at 216. The letter also informed Plaintiff that he had the right to appeal that decision to the Superintendent within thirty days.

The Superintendent received Plaintiff's appeal on October 3, 2008. Id. at 204-05. A hearing on Plaintiff's appeal took place on October 29, 2008, where he was represented by counsel and presented testimony and evidence. On November 20, 2008,

Superintendent Burgee issued a letter denying the appeal, finding that Plaintiff produced insufficient evidence upon which to conclude that the decision to terminate his employment was arbitrary, capricious, or illegal. Id. at 67-68. She also opined that the decision was warranted and well supported based upon the "significant employment issues" in Plaintiff's employment history. Id. The letter informed Plaintiff of his right to appeal the Superintendent's decision to the Board of Education within thirty days.

Plaintiff submitted his appeal to the Board on December 19, 2008. A hearing was conducted on March 4, 2009, at which Plaintiff, represented by counsel, again submitted testimony and evidence. The Board upheld Plaintiff's termination in an opinion issued March 25, 2009. Plaintiff was advised that he could appeal that decision to the State Board of Education but he did not do so.

## II. LEGAL STANDARD

Rules 56(a) & (c) of the Federal Rules of Civil Procedure provide in relevant part:

> A party may move for summary judgment, identifying each claim or defense or the part of each claim or defense - on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

A party asserting that a fact cannot be or is
genuinely disputed must support the assertion by: (A)
citing to particular parts of materials in the record,
including depositions, documents, electronically
stored information, affidavits or declarations,
stipulations (including those made for purposes of the
motion only), admissions, interrogatory answers, or
other materials; or (B) showing that the materials
cited do not establish the absence or presence of a
genuine dispute, or that an adverse party cannot
produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(a) & (c).

The Supreme Court's standard does not mean that any factual
dispute will defeat the motion:  "By its very terms, this
standard provides that the mere existence of some alleged
factual dispute between the parties will not defeat an otherwise
properly supported motion for summary judgment; the requirement
is that there be no <u>genuine</u> issue of <u>material</u> fact."  <u>Anderson</u>
<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in
original).  The party seeking summary judgment bears an initial
burden of demonstrating the absence of a genuine issue of
material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323
(1986).  Once the moving party has met that burden, the non-
moving party must come forward and demonstrate that such an
issue does, in fact, exist.  <u>See</u> <u>Matsushita Elec. Co., Ltd. v.</u>
<u>Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  As stated
above, "[t]he party opposing a properly supported motion for
summary judgment 'may not rest upon the mere allegations or
denials of [his] pleadings,' but rather must 'set forth specific

facts showing that there is a genuine issue for trial.'"
Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514,
525 (4th Cir. 2003) (alteration in original) (quoting Fed. R.
Civ. P. 56(e)).

In conducting the aforementioned analysis, a court
generally must view all facts and draw all reasonable inferences
in the light most favorable to the nonmoving party.  See Scott
v. Harris, 550 U.S. 372, 376-77 (2007).  However, "facts must be
viewed in the light most favorable to the nonmoving party only
if there is a 'genuine' dispute as to those facts."  Id. at 380.

## III. DISCUSSION

### A. First Amendment Rights

It is well settled that public employment cannot be
conditioned in a manner that would infringe upon the employee's
constitutionally protected interest in free expression.  Connick
v. Myers, 461 U.S. 138, 142 (1983).  Courts have also
recognized, however, that completely unfettered speech can be
disruptive to the workplace.  Thus, in considering free speech
claims of public employees, courts must seek "a balance between
the interests of the [employee], as a citizen, in commenting
upon matters of public concern and the interest of the State, as
an employer, in promoting the efficiency of the public services
it performs through its employees."  Pickering v. Bd. of Educ.,
391 U.S. 563, 568 (1968).

The basis for Plaintiff's First Amendment claim is his assertion that he was fired because he exercised his free speech rights when he contacted McCarthy with his complaints about the Maintenance Division. Defendants challenge the merits of this claim on a variety of grounds, including: (1) that Plaintiff's speech was not on a matter of public concern; (2) that Plaintiff's right to that speech did not outweigh the interests of FCPS in the efficient operation of the Maintenance Division; and (3) that Plaintiff would have been terminated regardless of speech in question.

Concerns respecting speech within the workplace of a governmental entity does not automatically confer on that speech the status of a matter of public concern. As the Supreme Court has noted,

> [t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark - and certainly every criticism directed at a public official - would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

Connick, 461 U.S. at 149. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. "[W]hen a public employee

speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Id. at 147.

From the record before the Court,[3] it would appear that much of the content of Plaintiff's communication with McCarthy involved merely personal matters. To the extent Plaintiff was complaining that his use of a work vehicle was taken away, that he was denied satellite parking privileges, or that he was suspended for insubordination, these are personal not public concerns. To the extent Plaintiff was reviving his allegations of timesheet fraud from 2007, that could possibly implicate a matter of public concern, although even that is questionable.

In arguing that he was raising an issue of public concern, Plaintiff relies exclusive on Pickering, suggesting that this case, was "[n]ot directly on point, but clearly analogous." Opp'n at iii. In Pickering, a public school teacher was dismissed after sending a letter to a local newspaper that was critical of the school board's handling of its financial resources. The letter was sent in connection with an election

_____

[3] As Plaintiff was less than forthcoming, at least initially, as to whether he had even contacted McCarthy, the precise content of his communication with her is not known.

seeking voter approval of a proposed increase in the township's tax rate. The Court found the teacher's dismissal violative of the First Amendment, opining that how funds allotted to the operations of the schools should be spent is a matter of public concern. 391 U.S. at 572. In reaching that conclusion, however, the Court specifically noted that the teacher's "statements are in no way directed toward any person with whom [the teacher] would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate supervisors or harmony among coworkers is presented here." Id. at 569-70. The Court also noted that there was "no occasion furnished by this case for consideration of the extent to which teachers can be required by narrowly drawn grievance procedures to submit complaints about the operation of the schools to their superiors for action thereon prior to bringing the complaints before the public." Id. at 572 n.4. For these reasons and others, this case is much less analogous to Pickering than Plaintiff would contend.

The Court also questions the public's concern about or interest in Plaintiff's timesheet allegations, given that they related to just four workers in a single cluster and to events that occurred more than a year prior and, most significantly, were proven to be unsubstantiated after a thorough

investigation.[4]  The <u>Pickering</u> Court also implied that a school
employee's speech would be entitled to less protection where
that employee "has carelessly made false statements about
matters so closely related to the day-to-day operations of the
schools that any harmful impact on the public would be difficult
to counter because of the [employee's] presumed greater access
to the real facts."  <u>Id.</u> at 572.

Were the Court to conclude that Plaintiff's speech did
relate to a matter of public concern, it would still find
Plaintiff's dismissal justified in that the modicum of public
concern related to the speech is significantly outweighed by
FCPS's interest in the efficient operations of the Maintenance
Division.  As detailed above, Plaintiff's unsubstantiated
accusations had left a trail of conflict and tension in that
Division.  Plaintiff's contact with the media only added to the
disruption and tension.  Furthermore, Plaintiff was very clearly
using the threat of going to the press to deflect criticism of

---

[4] The Court notes that Plaintiff has yet to come forward with
evidence to support his accusations.  With his opposition to
Defendants' summary judgment motion, Plaintiff did submit a few
pages of a printout which would appear to show some instances
where comp time taken by some employees exceeded the comp time
earned.  Pl.'s Ex. 13.  This "exhibit," however, is not
authenticated in any way, nor explained.  Plaintiff's counsel
also suggests that "[d]iscovery has revealed additional evidence
to support [Plaintiff's] allegations," but he declined to
produce that evidence, taking the position that "summary
judgment is not designed to force a plaintiff to outline his
entire trial strategy for an opposing party."  Opp'n at 4.

his own poor job performance and to interfere with Defendants'
efforts to discipline him for his conduct.

In a decision that this Court finds more analogous to the
instant action than Pickering, Connick v. Myers, the Supreme
Court employed the Pickering balancing test to determine whether
the termination of an assistant district attorney for
distributing a questionnaire that was implicitly critical of her
supervisors was a violation of her right to free speech. 461
U.S. 138. After finding that one of the questions on her
questionnaire touched on a matter of public concern and
contributed to her discharge, the Court noted that, under
Pickering, the government's "burden in justifying a particular
discharge varies depending upon the nature of the employee's
expression." Id. at 150. The Court continued, opining that the
"Pickering balance requires full consideration of the
government's interest in the effective and efficient fulfillment
of its responsibilities to the public." Id.

> "To this end, the Government, as an employer, must
> have wide discretion and control over the management
> of its personnel and internal affairs. This includes
> the prerogative to remove employees whose conduct
> hinders efficient operation and to do so with
> dispatch. Prolonged retention of a disruptive or
> otherwise unsatisfactory employee can adversely affect
> discipline and morale in the work place, foster
> disharmony, and ultimately impair the efficiency of an
> office or agency."

Id. (quoting Arnett v. Kennedy, 416 U.S. 134, 168 (1974)).

In determining whether the plaintiff's termination was justified, the Court in <u>Connick</u> found it significant that the plaintiff circulated the questionnaire immediately after she was informed that she was being transferred, a transfer to which she objected. The Court noted that "[w]hen employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." <u>Id.</u> at 153. The Court then concluded that "[t]he limited First Amendment interest involved here does not require that [the district attorney] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. [The plaintiff's] discharge therefore did not offend the First Amendment." <u>Id.</u> at 154.

Likewise, the minimal public concern related to Plaintiff's allegations is overshadowed by the disruption those allegations were causing in the workplace.

In a closely related argument, Defendants contend that Plaintiff's free speech claim must fail as he would have been fired anyway, regardless of any contact he may have had with the media. <u>See</u> Mot. at 18 (citing <u>Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle</u>, 429 U.S. 274, 286 (1977)). In <u>Mt. Healthy</u>,

which this Court finds most analogous to the case at bar, the
plaintiff was an untenured teacher who was not rehired after he
conveyed to a local radio station the substance of an internal
memorandum written by his principal. The Court described this
contact with the media as "[c]hronologically the last in the
series of incidents which [the plaintiff] was involved during
his employment," a series of incidents which included: an
altercation with another teacher, an argument with school
cafeteria employees, an incident in which he swore at students,
and an incident in which he made obscene gestures to girl
students. 429 U.S. at 281-82. The district court found that,
because the plaintiff's contact with the radio station had
played a "substantial part" in the decision not to rehire the
plaintiff, he had established a First Amendment claim and
ordered that he be reinstated to his position.

In overturning that decision, the Supreme Court observed:

> [a] rule of causation which focuses solely on whether
> protected conduct played a part, "substantial" or
> otherwise, in a decision not to rehire, could place an
> employee in a better position as a result of the
> exercise of constitutionally protected conduct than he
> would have occupied had he done nothing. The
> difficulty with the rule enunciated by the District
> Court is that it would require reinstatement in cases
> where a dramatic and perhaps abrasive incident is
> inevitably on the minds of those responsible for the
> decision to rehire, and does indeed play a part in
> that decision even if the same decision would have
> been reached had the incident not occurred. The
> constitutional principle at stake is sufficiently
> vindicated if such an employee is placed in no worse a

position than if he had not engaged in the conduct.  A
borderline or marginal candidate should not have the
employment question resolved against him because of
constitutionally protected conduct.  But that same
candidate ought not to be able, by engaging in such
conduct, to prevent his employer from assessing his
performance record and reaching a decision not to
rehire on the basis of that record, simply because the
protected conduct makes the employer more certain of
the correctness of its decision.

Id. at 285-86.

Here, Plaintiff's employment record by the time he was

terminated included no less than fourteen disciplinary actions,

including: multiple formal warnings, a five-day suspension

without pay, a thirty-day suspension without pay, two remedial

action plans, and a "Last Chance Agreement" which Plaintiff

proceeded to breach.  The conduct for which Plaintiff was

disciplined included: tardiness; absenteeism; insubordination,

which included several incidents of outright refusal to follow

the orders of a supervisor; repeatedly bypassing appropriate

channels to voice grievances; vulgarity; altercations with other

employees; and the failure to attend mandatory EAP sessions.

Plaintiff does not dispute that he was repeatedly disciplined

nor does he dispute, for the most part, that he engaged in the

conduct for which he was disciplined.  In fact, he rather

cavalierly notes that he "was regularly not fired for various

alleged violations for almost a decade, including allegedly

violating more than one 'last chance' agreement."  Opp'n at v.

The record indisputably reveals that Plaintiff was headed for termination regardless of whether he contacted the media. That he did engage in arguably protected conduct cannot immunize him from the ramifications of a poor work history and blatant insubordination.  To provide that immunization would create precisely the difficulties about which the Mt. Healthy Court was concerned.

For each of these reasons, the Court finds that Plaintiff's First Amendment claim fails.

### B. Breach of Contract and Due Process Rights

To support his breach of contract claim, Plaintiff submits several pages of the Support Services Discipline Policy, Pl.'s Ex. 1, and suggests that these policies render him more than a "mere at-will" employee.  Opp'n at 2.  The Discipline Policy lists numerous behaviors for which an employee can be disciplined or terminated, including: vulgarity and profanity, verbal abuse on school property, tardiness, absenteeism, and insubordination.  § 323.1.C.  The Policy also states, however, that the list is not exhaustive and that support employees can be disciplined or terminated for other actions and behaviors which "in the opinion of supervisory staff, are unacceptable." § 323.1.A.  Furthermore, while the Policy sets out guidelines for progressive discipline, it also allows the employer "the right to deviate from the suggested guidelines and issue a more

severe consequence when deemed appropriate." § 323.2.  The
Policy lists certain offenses for which an employee can be
immediately terminated, but also allows appropriate school
officials to immediately terminate support employees for other
offenses "when appropriate in the judgment of the school
system." § 323.2.E.

While the protections afforded employees under the Policy
are tempered by the discretion afforded the employer, the Policy
does provide that employees will be provided due process in the
administration of the discipline policy.  § 323.1.A.  Plaintiff
argues for nothing more than due process under the progressive
discipline structure of his employment agreement.  See Opp'n at
9 ("plaintiff's employment involved employment policies that
required due process (at minimum notice and a hearing) – and
also at least multiple levels of decision making before employee
could be terminated.").  Thus, Plaintiff's breach of contract
claim is essentially the same as his constitutional due process
claim.

The Court finds that Plaintiff was given all that the
Discipline Policy promised and more than is required under the
Constitution.  Plaintiff was always given notice and an
opportunity to be heard before any discipline was imposed and,
on several occasions, was able to moderate the discipline as a
result of the hearing.  In July of 2007, after Plaintiff was

given notice of a recommendation for termination after he refused to attend a meeting to discuss his insubordination, he had a hearing and was given a Performance Correction Plan in lieu of termination. As a result of Plaintiff's conduct in April and May of 2008, Plaintiff was given notice that he would be terminated but, after a meeting, was able to reduce that termination to a thirty-day suspension and entry into a Last Chance Agreement. Prior to his termination on July 24, 2008, Plaintiff was given notice and a hearing was held on July 16, 2008, where Plaintiff was represented by counsel. When he appealed his termination, the Superintendent heard testimony and took evidence from Plaintiff where he was again represented by counsel. Finally, upon appeal of the Superintendent's decision, the Board heard testimony and took evidence from Plaintiff where he was again represented by counsel. Plaintiff was given notice of the availability of an additional level of appeal but chose not to pursue it.

Plaintiff does not deny that he was given notice of each of these proposed disciplinary actions, or that hearings were held prior to the imposition of those actions. Instead, Plaintiff simply alleges that all of these hearings were shams. The only evidence proffered by Plaintiff to support that conclusion, however, is the July 9, 2009, email from Wilkinson to Hagans which Plaintiff misrepresents as demonstrating that "the

decision to terminate [P]laintiff was made within roughly three hours of defendant['] s learning of the speech." Opp'n at iv; <u>see also</u> <u>id.</u> at 3 (characterizing this email as "recommending that plaintiff be terminated"). Wilkinson's email, however, only stated that, "<u>[i]f after meeting with [Plaintiff]</u> . . . <u>you find</u> that he has disregarded the conditions of his suspension and the Last Chance Agreement, I recommend that he be terminated." What Wilkinson stated is very different from Plaintiff's characterization of the email and, furthermore, is wholly consistent with Plaintiff's right to notice and a hearing.

As the Court finds that the evidence conclusively demonstrates that Plaintiff was given notice and a hearing when each disciplinary action was taken and at each step in the process, the Court will enter judgment in favor of Defendants on Plaintiff's constitutional due process and breach of contract claims.

## IV. CONCLUSION

For these reasons, judgment will be entered in favor of Defendants on each of Plaintiff's remaining claims. A separate order will issue.

June 16, 2011                    _____/s/_____
                                 William M. Nickerson
                                 Senior United States District Judge